IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ALVIN TAYLOR,

        Petitioner,

v.

GREGORY VAN RYBROEK,

        Respondent.

OPINION AND ORDER

21-cv-440-wmc

---

After being found not guilty by reason of mental disease or defect on four counts of first-degree murder, and now committed to the Wisconsin Department of Health Services ("DHS"), petitioner Alvin Taylor has filed a petition for writ of habeas corpus under 28 U.S.C § 2254. Specifically, Taylor argues that the Wisconsin Court of Appeals misapplied the standard of proof articulated by the United States Supreme Court in *Foucha v. Louisiana*, 504 U.S. 71 (1992), in rejecting his arguments that the Wisconsin statute governing petitions for conditional release, Wis. Stat. § 971.17(4)(d), is unconstitutional facially and as applied to him. For the reasons explained below, the court will deny Taylor's petition.

BACKGROUND[1]

**A. Taylor is Charged and Committed**

Taylor killed four people over the course of several years in the 1980s. He subsequently pleaded not guilty by reason of mental disease or defect ("NGI") on four

---

[1] Unless otherwise noted, the facts are drawn from the Wisconsin Court of Appeals' decision. (Dkt. #8-5.)

counts of first-degree murder in violation of Wis. Stat. § 940.01 (1985-86) and "guilty/no contest" to one count of attempted murder over the course of four, separate criminal proceedings in Dunn, Eau Claire, and Washington counties.[2] Absent his NGI plea, the maximum penalty for first-degree murder would have been life imprisonment. Ultimately, he was committed to the DHS for an indeterminate period based on a diagnosis of "psychotic spectrum disorder." (Dkt. #8-10, at 133.)

### B. Taylor's Petition for Conditional Release and Hearing

Under Wis. Stat. § 971.17(4)(d) (2017-18), a Wisconsin circuit court "shall grant [a petition for conditional release] unless it finds by clear and convincing evidence that [petitioner] would pose a significant risk of bodily harm to himself or herself or to others or of serious property damage if conditionally released." The statute further instructs that,

> [i]n making this determination, the court may consider without limitation because of enumeration, the nature and circumstances of the crime, the person's mental history and present mental condition, where the person will live, how the person will support himself or herself, what arrangements are available to ensure that the person has access to and will take necessary medication, and what arrangements are possible for treatment beyond medication.

*Id.*

Having unsuccessfully petitioned for his conditional release repeatedly since 2013, Taylor filed another petition for conditional release in April 2017 in Washington County Circuit Court, *State v. Taylor,* Case No. 1987CF000368A. The circuit court then ordered psychological examinations by Drs. Deborah Collins and William Merrick to evaluate

---

[2] *See* Case Nos. 1987CF000021; 1987CF000030 1987CF000467 (one count attempted murder and one count first-degree murder); 1987CF000368A.

2

whether it would be appropriate to release him conditionally. (Dkt. #8-2, at 31, 51.) In their respective reports, Drs. Collins and Merrick agreed that Taylor had not displayed signs or symptoms of a psychotic spectrum disorder for many years; and Dr. Collins noted that he was no longer prescribed psychotropic medication. (Dkt. #8-2, at 45, 63.) Even so, the doctors agreed that Taylor still had an unspecified personality disorder with antisocial and narcissistic traits, along with alcohol and cannabis use disorders in remission in a controlled environment. (*Id.* at 45, 60.)

Ultimately, Dr. Collins recommended *against* granting Taylor's petition because he continued to pose a significant risk of bodily harm to himself or others. In particular, Collins noted: Taylor's rule violations at Mendota Mental Health Institute ("MMHI"), like self-publishing an autobiographical book; his "boundary issues" with MMHI staff; his history of violence; and Taylor's belief that any purported recovery from past psychotic symptoms was the result of his personal will, which is inconsistent with the documented course of his actual mental illness. (*Id.* at 44-45.) For his part, Dr. Merrick supported Taylor's conditional release, although he also recommended "round-the-clock" supervision and support. (*Id.* at 64.) In concluding that release would be appropriate, Merrick emphasized Taylor's stable mental condition; lack of psychiatric symptoms; and his "very low" risk of causing harm to himself, others, or property. (*Id.* at 62-63.) As for Taylor's book, Merrick opined that it "offers exactly what Dr. Collins noted was required to understand with reasonable professional certainty the psychological 'underpinnings' of those heinous murders he committed in the mid-1980s." (*Id.* at 62.)

Next, MMHI staffers, including Taylor's psychiatrist, Dr. Odette Anderson, wrote a letter recommending against Taylor's release. (*Id.* at 46-50.) Specifically, these staffers noted that Taylor: (1) ignored a staff directive that he could not speak with an IT person; (2) walked into a small linen closet without permission to help a female staff member reach something, while commenting, "I'm just so comfortable with you, I forget . . . See this is why they should let me out"; and (3) published an autobiographical book despite staff having denied him permission to do so. (*Id.* at 47-48.)

The circuit court then held a three-day hearing, at which Dr. Collins testified that Taylor had a "personality disorder," as "distinguish[ed] from a mental illness proper," explaining the former reflected "an individual's characteristic way of seeing the world." (Dkt. #8-10, at 144.) Dr. Collins further testified that Taylor had not engaged in "overt acts of violence" since 2010, but had felt compelled to kill another patient at MMHI and had several rule and security violations. (*Id.* at 165-66.) Dr. Merrick added that most of Taylor's recent rule violations were relatively insignificant, and he had no major rule violations for many years. (*Id.* at 225-26.) While disagreeing with Collins' testimony that a personality disorder was not a mental illness, testifying that "[i]t is a mental condition," Merrick further opined that Taylor's delusional disorder had remitted over time, initially with psychoactive medications, then through therapy and strong relationships with treatment providers. (*Id*. at 243, 291-92.) Finally, as his treating psychiatrist, Dr. Anderson testified that she still recommended against Taylor's release because he posed a significant risk to himself and others, noting in particular that Taylor broke rules and pushed boundaries, even in his highly structured environment. (*Id.* at 26-32.)

4

### C. Circuit Court 2018 Denial of Taylor's Petition

In a March 2018 oral decision, Washington County Circuit Judge Andrew Gonring denied Taylor's petition for release, explaining that the outcome "hinge[d] on … the nature and circumstances of the crime and Mr. Taylor's mental history and present mental condition." (Dkt. #8-11, at 32-33.)  As for the former, Judge Gonring summarized that Taylor "basically in cold blood executed four innocent individuals in three separate counties."  (*Id.* at 34.)  As for the latter, the judge acknowledged Taylor's history of treatment at MMHI since 1988, noting that the accuracy of his original diagnosis of "psychotic spectrum disorder" was a "double-edged sword" because, if the diagnosis was correct, it raised the question of whether it might return once Taylor was released from confinement, but if he never had that mental illness, it left the court to speculate about why he became a serial killer.  (*Id.* at 34-35.)  In any event, the court noted that Drs. Collins and Merrick were "essentially in agreement" that Taylor currently had a "personality disorder not otherwise specified with antisocial and narcissistic traits together with cannabis and alcohol dependency in remission in a structured setting." (*Id.* at 35-36.)

Ultimately, the court found that Taylor posed a significant risk of harm to others if conditionally released based, in large part, on the letter from MMHI staff who know him best and "clearly think Mr. Taylor cannot be safely released to the community." (*Id.* at 42-43.)  The court also noted that the opinions of the MMHI staff aligned with Dr. Collins's opinion that Taylor was not ready for release.  (*Id.*)  As for Dr. Merrick's lone support for Taylor's release, Judge Gonring noted that even he found Taylor would need 24-hour supervision upon release.  (*Id.* at 34.)

5

### D. Postconviction Motion and Direct Appeal

In 2019, pointing out the "State may also confine a mentally ill person if it shows 'by clear and convincing evidence that the individual is mentally ill and dangerous,'" *Foucha,* 504 U.S. at 80 (quoting *Jones v. United States*, 463 U.S. 354, 362 (1983)), Taylor next filed a "postdisposition" motion, asserting that Wis. Stat. § 971.17(4)(d) is unconstitutional facially and as applied to him. Taylor argued that there was no evidence that he remained mentally ill, and under *Foucha,* it was unconstitutional to confine a non-mentally ill person under an insanity commitment. The circuit court denied the postdisposition motion in April 2019, determining that it was bound by *State v. Randall,* 192 Wis. 2d 800, 532 N.W.2d 94 (1995), which held "that it is not a denial of due process to confine an insanity acquittee who has committed a criminal act to a state mental health facility for as long as that individual is considered dangerous, provided that the commitment does not exceed the maximum term of imprisonment which could have been imposed for the offense charged." (Dkt. #8-6, at 80-81.)

Taylor then appealed to the Wisconsin Court of Appeals. (Dkt. #8-2, at 2-26.) In 2020, the Wisconsin Court of Appeals summarily affirmed the circuit court's denial of Taylor's petition for conditional release and postdisposition motion. First, concluding that it, too, was bound by *Randall,* the court rejected Taylor's facial challenge to Wis. Stat. § 971.17(4)(d). Second, the court rejected Taylor's as-applied challenge, concluding that "[n]ot much separates Taylor's facial challenge from his as-applied challenge." (Dkt. #8-5, at 6.) As a result, again reasoning that it was bound by *Randall*, the court held that "confinement of an acquittee can continue when he or she poses a danger and 'so long as

6

the state houses the acquittee in a facility appropriate to his or her condition and provides the acquittee with care and treatment to overcome that which makes him or her dangerous.'" (*Id*. at 6-7 (quoting *Randall*, 192 Wis. 2d at 833-34).) Since Taylor made no argument suggesting that was not the case, the court of appeals affirmed. *Id.* Thereafter, the Wisconsin Supreme Court denied Taylor's petition for review. (Dkt. #8-8.)

OPINION

Before this court, petitioner argues that he is no longer mentally ill, and therefore, his continued confinement is a violation of *Foucha*. More specifically, he asserts that Wisconsin's alleged failure to consider his current mental status in deciding whether to conditionally release him from confinement under Wis. Stat. § 971.17(4)(d) is a violation of his due process rights. As he did in state court, the court understands petitioner to be asserting that § 971.17(4)(d) is unconstitutional both facially and as applied to him.

Federal courts may grant a state prisoner's habeas petition only if the state court's denial of relief "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "was based on an unreasonable determination of the facts in light of the evidence presented." 28 U.S.C. § 2254(d)(1)-(2). The court does not understand petitioner to challenge the state court's factual findings, nor could he on this record, so the sole issue presented is whether the Wisconsin Court of Appeals' decision either: (1) reaches a conclusion on a question of law opposite to that reached by the Supreme Court; or (2) decides a case differently than the Supreme Court has on materially indistinguishable facts. *Williams v.*

7

*Taylor*, 529 U.S. 362, 412-13 (2000). For the application of law to be unreasonable, the decision must be "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011). It is petitioner's burden to show an error under § 2254(d). *Westray v. Brookhart*, 36 F.4th 737, 746 (7th Cir. 2022).

In *Foucha*, petitioner Terry Foucha was charged by Louisiana authorities with aggravated burglary and illegal discharge of a firearm, and he was committed to a mental health facility after the trial court found him not guilty by reason of insanity. 504 U.S. at 73-74. Louisiana's statutory scheme provided that, "[w]hen a defendant in a criminal case pending in Louisiana is found not guilty by reason of insanity, he is committed to a psychiatric hospital unless he proves that he is not dangerous." *Id.* at 73. After four years of confinement, the superintendent of a Louisiana mental health facility recommended that Foucha be discharged or released. *Id.* at 74. A two-doctor "sanity commission" further reported that Foucha was "presently in remission from mental illness," but explained that they were unable to "certify that he would not constitute a menace to himself or others if released." *Id.* at 74-75. In particular, the doctors noted that while Foucha had "an antisocial personality," that condition was not a "mental disease" or "treatable." *Id.* at 75. Based on these findings, a state trial court determined that Foucha was dangerous to himself and others and ordered him returned to the mental institution. *Id.* Louisiana's appellate courts affirmed the trial court, and the U.S. Supreme Court granted certiorari. *Id.*

8

Because it was undisputed that he was not mentally ill at the time of the lower court's hearing, four Supreme Court justices determined that "the basis for holding Foucha in a psychiatric facility as an insanity acquittee has disappeared, and the State is no longer entitled to hold him on that basis." *Id.* at 78. Those four also rejected Louisiana's assertion that it could continue to confine Foucha based solely on an antisocial personality that made him dangerous to himself and others. *Id.* Even if Foucha's continued confinement were constitutionally permissible, the plurality further reasoned that based on a finding of dangerousness alone, keeping him against his will in a mental institution was inappropriate absent a determination in civil commitment proceedings that he *was* mentally ill with "constitutionally adequate procedures to establish the grounds for his confinement." *Id.* at 78-79. Regardless, because Louisiana conceded that Foucha was not suffering from a mental disease or illness, and due process "requires that the nature of commitment bear some reasonable relation to the purpose for which the individual is committed," the plurality held that Foucha could no longer be held as a mentally ill person and, because Foucha was never convicted, Louisiana had no interest in punishing him. *Id.* at 79-80.

Justice O'Connor cast the fifth and deciding vote in a concurring opinion. Although she agreed with the majority that Louisiana's scheme violated the Due Process Clause, she wrote separately to emphasize the limitations of the Court's holding:

> Louisiana asserts that it may indefinitely confine Terry Foucha in a mental facility because, although not mentally ill, he might be dangerous to himself or to others if released. For the reasons given in Part II of the Court's opinion, this contention should be rejected. I write separately, however, to emphasize that the Court's opinion addresses only the specific statutory scheme before us, which broadly permits indefinite confinement of sane insanity acquittees in psychiatric facilities. This case does not require us to pass judgment on more narrowly drawn laws that provide for detention of insanity acquittees,

9

> or on statutes that provide for punishment of persons who commit crimes while mentally ill.
>
> I do not understand the Court to hold that Louisiana may never confine dangerous insanity acquittees after they regain mental health.

*Id.* at 86-87 (O'Connor, J., concurring).

By way of further explanation, Justice O'Connor noted that an insanity defense only became relevant under Louisiana law after the prosecution had already established that the defendant committed criminal acts beyond a reasonable doubt, providing "concrete evidence" of the defendant's dangerousness. *Id.* at 87. By contrast, she noted that "the only certain thing that can be said about the present state of knowledge and therapy regarding mental disease is that science has not reached finality of judgment." *Id.* (alteration adopted and quotation marks omitted). Thus, in her view, it might be permissible for Louisiana to confine an insanity acquittee who has regained sanity "if the nature and duration of detention were tailored to reflect pressing public safety concerns related to the acquittee's continuing dangerousness." *Id.* at 87-88. Still, Justice O'Connor explained that to confine an acquittee solely as a mental patient, the State would require "some medical justification for doing so." *Id.* at 88.

Three years after *Foucha*, the Wisconsin Supreme Court issued its opinion in *Randall*, reading *Foucha* "to permit the continued confinement of dangerous but sane acquittees in a mental health facility, so long as they are treated in a manner consistent with the purposes of their commitment, *e.g.*, there must be a medical justification to continue holding a sane but dangerous insanity acquittee in a mental health facility." 192 Wis. 2d at 807. Relatedly, *Randall* concluded that "[t]o be constitutionally permissible,

10

the continued confinement of a sane but dangerous insanity acquittee in a mental health facility[ ] must have some therapeutic value." *Id.* at 817. The *Randall* court also distinguished Wis. Stat. § 971.17(4)(d) from Louisiana's unconstitutional scheme because Wisconsin law did not authorize "indefinite" detention; instead, it limited time in detention to that justified by the sentence for the underlying criminal conduct, then placing the burden of further justifying detention on the state, while the petitioner had the burden in Louisiana. *Id.* at 808. With these rulings in mind, the court turns to petitioner's facial and as-applied challenges here.

## I. Facial Challenge

Petitioner argues that Wis. Stat. § 971.17(4)(d) facially violates the U.S. Constitution because it permits confinement of insanity acquittees who are no longer mentally ill. However, the Seventh Circuit recently rejected that same argument in *Stowe v. Rybroek*, 114 F.4th 630 (7th Cir. 2024), *cert. denied*, 145 S. Ct. 1101, 220 L. Ed. 2d 407 (2025). As here, Stowe had argued that "Wis. Stat. § 971.17(4)(d) violates the Due Process Clause of the Fourteenth Amendment, as understood in [*Foucha*], because it allows the state to keep in custody someone who is a danger to self or others without finding that this person also has a mental disease or defect." *Id.* at 632. Because Justice O'Connor provided the controlling vote, the Seventh Circuit held that her separate concurrence limited the scope of the holding in *Foucha*, "stress[ing] features of Louisiana's system that § 971.17 does not share." *Id.* at 633. Thus, the Seventh Circuit emphasized that a "decision that turns on elements specific to one state's system does not 'clearly establish' the invalidity of another state's system," explaining that it did not "see a stark

11

incompatibility between the Wisconsin *Randall* and Justice O'Connor's views." *Id.* Accordingly, even if petitioner in this case is confined indefinitely, such confinement would be consistent with Wisconsin's life sentence for first-degree murder. Wis. Stat. § 939.50(3)(a). Regardless, the Seventh Circuit determined that even if *Randall* misread Justice O'Connor's concurrence, "the fact remains that § 971.17(4)(d) permits courts to consider evidence of a detainee's 'present mental condition[,]'" which for many people, would include proof of ongoing mental disease. *Id*. at 634. Thus, the court concluded that "it assuredly cannot be confident that no set of circumstances exists under which [§ 971.17(4)(d)] would be valid," as is required for facial constitutional challenges arising under amendments other than the First Amendment. *Id.* Based on this recent, binding precedent alone, therefore, the court must reject petitioner's facial challenge to Wis. Stat. § 971.17(4)(d).

## II.  As-Applied Challenge

The court understands petitioner is also asserting that Wis. Stat. § 971.17(4)(d) is unconstitutional as applied to him in particular because he suffered from a psychotic spectrum disorder at the time of his commitment and experts now agree that he no longer suffers from that condition. Thus, he argues, there is no evidence that he has a "current, qualifying mental condition." (Pet. Br. (dkt. #9) 21.)

To begin, petitioner's as-applied argument depends on the correctness of his assertion that his current diagnosis of a "personality disorder with narcissistic and antisocial traits along with his cannabis and alcohol use disorders" are not considered "mental diseases or defects" under Wisconsin law. *E.g.*, Wis. Stat. § 971.15(2) ("As used

12

in this chapter, the terms 'mental disease or defect' do not include an abnormality manifested only by repeated criminal or *otherwise antisocial* conduct.") (emphasis added). Even if petitioner's conditions would not qualify as mental illnesses under Wisconsin law, this would be a question of interpretation of state law, not necessarily one warranting federal habeas relief, which requires an unreasonable application of clearly established *federal* law. 28 U.S.C. § 2254(d)(1)-(2); *Estelle v. McGuire*, 502 U.S. 62, 67 (1991) ("federal habeas corpus relief does not lie for errors of state law") (quotation marks omitted).

In fairness to petitioner, he points to both *Foucha* and the United States Supreme Court's later decision in *Kansas v. Hendricks*, 521 U.S. 346 (1997), as support for the argument that his current diagnosis does not qualify as mental illnesses under federal law. However, neither case stands for that proposition. *See Harris v. Cotton*, 365 F.3d 552, 555 (7th Cir. 2004) ("A rule is clearly established only if it is compelled by existing Supreme Court precedent.") (quotation marks omitted). *First*, *Foucha* did not hold that an antisocial personality disorder was not a mental illness; instead, a doctor at the state court trial testified that antisocial personality was "untreatable," and "not a mental disease," a position that Louisiana did not dispute. *Foucha*, 504 U.S. at 75, 80. In fact, the Supreme Court later recognized that the term "mental illness" is "devoid of any talismanic significance," adding that "psychiatrists disagree widely and frequently on what constitutes mental illness." *Hendricks*, 521 U.S. at 359. Case in point, Drs. Collins and Merrick disagreed about whether petitioner's personality disorder was a "mental illness," and

13

Collins testified that MMHI staff saw "no reason" for petitioner to have medication because they saw "no signs of a mental illness." (Dkt. #8-10, at 161.)[3]

*Second*, under *Hendricks*, petitioner asserts that "[a] constitutional commitment statute is one that 'requires a finding of future dangerousness, and then links that finding to the existence of a mental abnormality or personality disorder that makes it difficult, if not impossible, for the person to control his dangerous behavior.'" (Pet. Br. (dkt. #9) 23 (quoting *Hendricks*, 521 U.S. at 358).) Although underdeveloped, the court understands petitioner to be asserting the Wisconsin Court of Appeals unreasonably applied *Hendricks*, there being insufficient evidence that he had difficulty controlling his behavior. However, the Supreme Court's observation about control in *Hendricks* does not amount to "clearly established Federal law." To the contrary, in *Kansas v. Crane*, 534 U.S. 407 (2002),[4] the Supreme Court later clarified that *Hendricks* required something more than commitment "without *any* lack-of-control determination," but did not require "*total* or *complete* lack of control." *Id.* at 411-13 (emphases original). At minimum, "[w]here between these two extremes a person's difficulty in controlling his behavior must fall remains open to decision one case at a time," prompting the Seventh Circuit to find that the "serious difficulty"

---

[3] Petitioner does not rely on the doctors' disagreement about whether his personality disorder was a mental illness or Dr. Collins's suggestion that he required no medication as grounds for habeas relief.

[4] *Hendricks* and *Crane* addressed the constitutionality of Kansas's "Sexually Violent Predator Act," which created "procedures for the civil commitment of persons who, due to a mental abnormality or a personality disorder, are likely to engage in predatory acts of sexual violence." *Hendricks*, 521 U.S. at 350 (quotation marks omitted).

standard discussed in *Hendricks* and *Crane* is not a "clearly established rule that the state judiciary could transgress." *Varner v. Monohan*, 460 F.3d 861, 864 (7th Cir. 2006).

Even if the control standard discussed in *Hendricks* were deemed clearly established, federal law, the record suggests that petitioner continues to have control issues, having failed to follow boundaries with IT staff, published an autobiographical book against MMHI staff directives, and walked into a small linen closet with a female MMHI staffer. All of these events were sufficiently disturbing to be of concern to staff, and while there is some evidence to the contrary (*e.g.*, his return to maximum privileges at MMHI) (dkt. #8-2, at 58), the possibility of disagreement is not enough to warrant habeas relief. *Harrington*, 562 U.S. at 103.

Finally, petitioner alludes to being denied constitutionally adequate procedures to establish grounds for his continued confinement, but fails to explain why the current procedures are inadequate. (Pet. Br. (dkt. #9) 23.) Thus, petitioner waived this argument by not developing it further, and the court will not address it further. *United States v. McGhee*, 98 F.4th 816, 824 (7th Cir.), *cert. denied*, 145 S. Ct. 456 (2024). Accordingly, petitioner has also failed to establish that Wis. Stat. § 971.17(4)(d) is unconstitutional as applied to him.

### III. Certificate of Appealability

The final remaining question on habeas review is whether to grant petitioner a certificate of appealability. Under Rule 11 of the United States District Courts Rules Governing Section 2254 cases, the court must issue or deny a certificate of appealability

when entering a final order adverse to a petitioner. To obtain a certificate of appealability, the applicant must make a "substantial showing of the denial of a constitutional right." *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting 28 U.S.C. § 2253(c)(2)). A substantial showing means that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller El v. Cockrell*, 537 U.S. 322, 336 (2003) (quotation marks omitted). While finding petitioner's facial challenge barred by *Stowe*, he is entitled to a certificate of appealability as to whether Wis. Stat. § 971.17(4)(d) is unconstitutional as applied to him because reasonable jurists could find the court's assessment debatable.

## ORDER

IT IS ORDERED that:

1) Alvin Taylor's petition for a writ of habeas corpus under 28 U.S.C § 2254 (dkt. #1) is DENIED.

2) A certificate of appealability under 28 U.S.C. § 2253(c)(2) is GRANTED as set forth above.

Entered this 2nd day of February, 2026.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge